*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0256p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ALBERTO MONCIVAIS,

*Defendant-Appellant.*

No. 05-6689

>

---

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 01-20087—Robert H. Cleland, District Judge.

Submitted: June 7, 2007

Decided and Filed: July 10, 2007

Before: CLAY, GILMAN, and McKEAGUE, Circuit Judges.

---

## COUNSEL

---

**ON BRIEF:** James A. Simmons, Nashville, Tennessee, for Appellant. Stuart J. Canale, ASSISTANT UNITED STATES ATTORNEY, Memphis, Tennessee, for Appellee.

---

## OPINION

---

CLAY, Circuit Judge. Defendant Alberto Moncivais appeals his sentence of 336 months imprisonment imposed following a guilty plea. Defendant pled guilty to one count of conspiracy to possess with intent to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846. On appeal, Defendant contends that: (1) the district court erred by sentencing him based on evidence that was inadmissible as a matter of law due to its unreliability; (2) the district court erred by concluding that Defendant was an "organizer or leader" and enhancing his advisory United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range by four points pursuant to U.S.S.G. § 3B1.1(a); (3) the government breached the plea agreement; (4) the district court violated Defendant's right to due process by finding facts at sentencing by a preponderance of the evidence; and (5) the district court violated Defendant's rights under the Confrontation Clause by admitting testimonial hearsay at sentencing, notwithstanding the fact that the declarant did not testify, and Defendant had not had an opportunity to cross-examine the declarant.

For the reasons stated below, we **AFFIRM** Defendant's conviction and sentence.

## BACKGROUND

Jerome and Anthony Davis were arrested on April 6, 2001, after providing undercover law enforcement officers with ten kilograms of cocaine. The Davis brothers agreed to cooperate, and their efforts led law enforcement officials to their supplier, Ruben Laurel, and ultimately to Defendant, a co-conspirator. Defendant was arrested at the Memphis airport on April 9, 2001, and subsequently indicted on several counts of conspiracy to distribute cocaine.

After Defendant filed a motion to suppress, which was denied, Defendant entered into a plea agreement (the "Agreement"). He agreed to plead guilty to conspiracy to possess with intent to distribute approximately 68 kilograms of cocaine as charged in count one of a superseding indictment. The government agreed to move for dismissal of count two of the superseding indictment at sentencing. Consistent with the quantity of 68 kilograms of cocaine charged in the superseding indictment, paragraph 5 of the Agreement stated that "[f]or the purpose of calculating the base offense level pursuant to [U.S.S.G. §2D1.1], the United States agrees to recommend that the relevant conduct which is readily provable as to the defendant would result in a base offense level of 36." J.A. at 123. Paragraph seven of the Agreement provided that:

> 7.    The government agrees that it will not recommend or request a sentencing enhancement for the defendant's role in the offense (§3B1.1) during the preparation of the Presentence Investigation Report (PSR). In this regard, Mr. MONCIVAIS understands that the government's position is not binding on the court or the probation office and that if the court does apply an enhancement for leadership role, he will not be allowed to withdraw his plea of guilty. This is not intended to limit either party in responding to issues raised at the sentencing hearing.

J.A. at 123-24. As a result of the Agreement, the district court issued an order changing Defendant's plea to guilty on June 10, 2002.

Instead of recommending a Guidelines base offense level of 36, as called for in the Agreement, the presentence investigation report ("PSR") prepared by the probation office recommended that the district court determine Defendant's Guidelines base offense level to be 38. The probation office made this recommendation after the government provided the probation office with information the government had obtained from Ruben Laurel, a co-conspirator.[1] The information provided by Laurel suggested that Defendant had been involved in the conspiracy since it began in September of 2001 (as opposed to coming in after the initial period as Defendant claimed), and, consequently, he was responsible for a substantially higher quantity of drugs. Instead of the 68 kilograms of cocaine stated in the plea agreement, the PSR calculated Defendant's recommended Guidelines range based on 299 kilograms of cocaine and over 1,000 kilograms of marijuana. The PSR also recommended a four-level enhancement for Defendant's role in the offense as an "organizer or leader of criminal activity that involved five or more participants or was otherwise extensive." J.A. at 550; *see* U.S.S.G. §3B1.1(a). The probation office relied heavily on information that the government obtained from Laurel in making these recommendations. Defendant filed timely objections to the PSR.

Defendant's first sentencing hearing took place on November 4, 2002. The government, through the testimony of Thomas Boock of the Drug Enforcement Agency Task Force, offered into evidence a "DEA 6," which was a report entitled "Proffer Statement of Ruben Laurel." J.A. at 355. Defendant objected to this statement on the ground that it constituted unreliable hearsay. One of the government's witnesses, Seanda Reed of the probation office, stated that this statement was used

---

[1] The PSR attributes this information to an unidentified "Cooperating Source;" at the original sentencing hearing it was established that this information came from Laurel.

by the probation department to determine the relevant offense conduct when calculating Defendant's recommended base offense level in the PSR.

At sentencing, the government supported the Guidelines enhancement for Defendant's role in the offense, and it did not strenuously contest the probation office's recommendation as to the drug quantities. Although "the government [] reiterated its recommendation concerning quantity," (*i.e.*, that the quantity of cocaine should be determined to be 68 kilograms), it also stated that "[t]he court has heard proof now, and we will submit that to the court" (which tended to show that the actual quantity was higher). J.A. at 385. The government also argued that the evidence demonstrated that Defendant was an organizer or leader, and that the applicable Guidelines range should be enhanced by four levels on account of this conduct on the part of Defendant.

The district court discussed Laurel's proffer in detail:

> [T]he statement of Laurel as summarized in the report is richly detailed and is within itself entirely consistent. It is consistent also with the facts, though it contains a great deal more detail than the facts known by the court at the time of the change of plea . . . .

> The statement of Laurel, though, goes on for 10 or 11 pages, . . . and provides an extraordinary amount of detail with respect to the way in which he met Mr. Moncivais, the dealings the two of them had, the loyalty Mr. Moncivais displayed or purported at least to Mr. Laurel when he learned that Mr. Laurel had not turned his name over as the marijuana supplier when Mr. Laurel was first arrested and went to prison and the dealings that emanated from that earlier relationship and went on for a period of years culminating here in Memphis.

> The statement is not only internally consistent and full of detail, but I find that it is essentially a credible statement, and it is a statement which certainly has the kinds of indicia of reliability that make it appropriate for receipt and for consideration as evidence in a sentencing calculation. It exceeds, in other words, the minimum indicia of reliability that the Sixth Circuit has instructed sentencing judges to identify when considering otherwise nonadmissible evidence, that is evidence that would not be admissible under the rules of evidence. This is hearsay. Even so, it has attributes of being admissible hearsay in that it is a statement against penal interest and substantially against penal interest, and it exposes or would tend to expose Mr. Laurel to very high levels of sentencing enhancement for his own activities which include organizing activities with respect to the delivery of cocaine and marijuana here in Memphis.

J.A. at 406-08. The district court found that, based primarily on Laurel's proffer statement, the correct Guidelines base offense level was 38.

The district court next concluded that Defendant was an organizer or leader for the purpose of U.S.S.G. § 3B1.1(a). The district court identified at least five participants. This included "four individuals that were nothing other than drivers," Laurel, the four sub-distributors (the Davis brothers, "Pettis," and a man nicknamed "Dookie"), and other participants. J.A. at 413. The district court concluded that "from the presentence report and from Laurel's statement, I would estimate the number of participants to be probably ten or 12 minimal." J.A. at 413. The district court also found that Defendant's behavior demonstrated that he was an organizer or leader. This finding was based on Laurel's proffer and a surreptitiously recorded telephone call between Laurel, Anthony Davis,

and Defendant.[2]  The district court considered the telephone call particularly significant because Laurel was "begging [Defendant] to listen to what [Anthony Davis] had to say" and Defendant "figuratively turned his back" on Davis and "figuratively looked Laurel in the eye and said, you know what you have to do.  To me, that's a pretty powerful indicat[or] of a supervisory relationship. He was giving orders."  J.A. at 415.  The district court noted that, in order for the enhancement to be proper, it need not find that Defendant supervised five other individuals; instead, the enhancement was proper if Defendant supervised at least one individual, the criminal activity involved five individuals, and there was some evidence of Defendant's organizational or leadership role.  Defendant's conduct, the district court concluded, satisfied this standard.

Finally, the district court held that, though Defendant did not deserve an enhancement for obstruction of justice, he would not receive credit for acceptance of responsibility.  After calculating the applicable Guidelines range, the district court sentenced Defendant to 360 months imprisonment, the bottom of the Guidelines range, to be followed by five years of supervised release.  Defendant filed a timely notice of appeal on November 14, 2002.

On March 24, 2005, this Court issued its opinion affirming Defendant's conviction but vacating his sentence.  *United States v. Moncivais*, 401 F.3d 751, 756-58 (6th Cir. 2005).  Defendant had challenged his conviction on the grounds that evidence of a recorded telephone call was admitted in violation of the Federal Wiretap Statute, 18 U.S.C. § 2510 *et. seq.*, and that he was arrested without probable cause.  *Id.* at 755-57.  Defendant had also challenged his sentence on the ground that it violated *United States v. Booker*, 543 U.S. 220 (2005).  *Id.* at 757-58.  This Court affirmed Defendant's conviction but vacated his sentence and remanded the case for resentencing consistent with *Booker*.  *Id.*

Prior to his resentencing, Defendant renewed his objections to the PSR.  On September 26, 2005, this case again came before the district court for resentencing in light of *Booker*.  The district court reaffirmed its factual findings, calculated the same Guidelines range, and again overruled Defendant's objections to the PSR.  The district court then applied the 18 U.S.C. § 3553(a) factors, and concluded that Defendant's minimum Guidelines sentence was "marginally too much, marginally an excessive sentence," J.A. at 517; it therefore sentenced Defendant to a below-Guidelines term of 336 months imprisonment, to be followed by five years of supervised release. On September 30, 2005, Defendant filed a timely notice of appeal.

---

[2]The transcript of this telephone call was produced by a Spanish translator retained by Defendant; the government stipulated to its accuracy:

> [Defendant]: Yeah.
> [Laurel]: (unintelligible words) I have my friend the AD on the line.
> [Defendant]: What for?
> [Laurel]: Well he wants to talk to you.
> [Defendant]: What for?
> [Laurel]: For you to know that every thing is all right.
> [Defendant]: But no, no, you know what you have to do.  Are you going to go to eat right now?
> (Inaudible voice . . . .of you all)
> [Laurel]: Actually that's what I'm telling him.
> [Anthony Davis]: Hello, Hello
> [Defendant]: Yeah Ruben?
> [Laurel]: Yeah
> [Defendant]: Don't talk to me right now, please.
> [Laurel]: All right.

*United States v. Moncivais*, 401 F.3d 751, 753 (6th Cir. 2005) (footnote omitted).

## DISCUSSION

### I.      Laurel's Proffer Statement Contained Sufficient Indicia of Reliability to be Admissible

Defendant's first argument on appeal is that Laurel's proffer statement was inadmissible at sentencing because it was hearsay that did not possess sufficient indicia of reliability. We review the district court's determination of reliability for abuse of discretion, *United States v. Bowker*, 372 F.3d 365, 392 (6th Cir. 2004), *vacated on other grounds*, 543 U.S. 1182 (2005); *United States v. Luciano*, 414 F.3d 174, 180 (1st Cir. 2005), and we review the district court's factual findings for clear error. *See United States v. Herrera*, 928 F.2d 769, 774 (6th Cir. 1991). The Due Process Clause of the Fifth Amendment also imposes a minimum standard of reliability for evidence admitted at sentencing. *See United States v. Silverman*, 976 F.2d 1502, 1504 (6th Cir. 1992) (en banc) (citing *United States v. Baylin*, 696 F.2d 1030, 1040 (3d Cir. 1982)). To the extent that Defendant's claims sound in due process, we review them *de novo*. *See United States v. Sanders*, 452 F.3d 572, 576 (6th Cir. 2006) ("A due process claim raising a mixed question of law and fact is reviewed de novo."), *cert. denied*, 127 S. Ct. 2130 (2007).

Generally, the Federal Rules of Evidence do not apply to sentencing proceedings, Fed. R. Evid. 1101(d)(3), and hearsay evidence is admissible at sentencing. *United States v. Davis*, 170 F.3d 617, 622 (6th Cir. 1999). However, U.S.S.G. § 6A1.3(a) does establish a minimum indicia-of-reliability standard that evidence must meet in order to be admissible in Guidelines sentencing proceedings. Section 6A1.3(a) states:

> When any factor important to the sentencing determination is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the court regarding that factor. In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, *provided that the information has sufficient indicia of reliabiltiy to support its probable accuracy.*

U.S.S.G. § 6A1.3 (emphasis added).

In *Silverman*, this Court, sitting en banc, concluded that this standard was also required as a matter of due process. 976 F.2d at 1504 ("This due process limit on the evidence a sentencing court may properly consider is recognized in the commentary to § 6A1.3."). We have characterized *Silverman* as setting "a relatively low hurdle," *United States v. Greene*, 71 F.3d 232, 235 (6th Cir. 1995), that asks only that "*some* evidentiary basis beyond mere allegation in an indictment be presented to support consideration of such conduct as relevant to sentencing." *Silverman*, 976 F.2d at 1504.

The evidence in this case, under the Guidelines and as a matter of due process, is clearly above the minimum standard of reliability required for the evidence to be admissible at sentencing. The district court found that Laurel's statement was "richly detailed," and was both internally and externally consistent. J.A. at 406. The district court also noted that the statement could conceivably be used to impeach Laurel if he subsequently testified to the contrary, and so even though it was offered under the promise of immunity, the possibility of the statement being used against Laurel's penal interests bolstered its reliability. These factual findings establish that Laurel's proffer statement was sufficiently reliable to be admitted at sentencing. *Compare United States v. Hunt*, 487 F.3d 347, 352-53 (6th Cir. 2007) (holding that two co-conspirators' hearsay statements were admissible when corroborated by each other and by circumstantial evidence) *with United States v. Lowenstein*, 108 F.3d 80, 83-84 (6th Cir. 1997) (concluding that the evidence did not contain sufficient indicia of reliability where the district court "relied solely upon a hearsay statement" that did not "mention the factual basis for the belief of the [declarant]").

Defendant contends that Laurel's statement was inadmissible because statements from a co-defendant that shift blame onto the defendant are presumptively unreliable. *See, e.g.*, *Lee v. Illinois*, 476 U.S. 530, 544 (1986) (noting that there exists a "time-honored teaching that a codefendant's confession inculpating the accused is inherently unreliable"). The cases upon which Defendant relies are distinguishable, however, because they do not concern sentencing.[3] This flaw is fatal. We have held that co-conspirators' hearsay statements are admissible at sentencing, notwithstanding the fact that such statements may be "suspect" on account of the co-conspirators' "explicit or implicit desire to secure favorable treatment from the police." *Hunt*, 487 F.3d at 352-53 (citing *United States v. Huckins*, 53 F.3d 276, 279 (9th Cir. 1995)).

Importantly, Defendant points to nothing about Laurel's proffer statement that suggests that it is unreliable, beyond its character as hearsay and the fact that Laurel was involved in the same conspiracy as Defendant. We have recently rejected an invitation to craft a rule that would consider co-conspirator hearsay "inherently unreliable," and would thus render such evidence presumptively inadmissible at sentencing. *Id*. Here, the district court made detailed and extensive findings as to the reliability of Laurel's proffer statement, and we accordingly hold that the district court did not err by admitting such evidence at sentencing.

## II.     The District Court did not Err by Concluding that Defendant was an Organizer or Leader

Next, Defendant argues that his sentence should be vacated because the district court enhanced his advisory Guidelines range by four points under U.S.S.G. § 3B1.1. We have not settled the question of what standard governs review of a sentencing enhancement under U.S.S.G. § 3B1.1. "Traditionally . . . we reviewed the district court's factual findings for clear error and its legal conclusions de novo." *United States v. McDaniel*, 398 F.3d 540, 551 n.10 (6th Cir. 2005) (citing *United States v. Henley*, 360 F.3d 509, 516 (6th Cir. 2004)). However, after the Supreme Court in *Buford v. United States* held that review under U.S.S.G. § 4B1.2 should be conducted "deferentially rather than *de novo*," 532 U.S. 59, 64 (2001), this Court has "found it unnecessary to determine whether *Buford* requires us to alter the standard of review we apply in reviewing § 3B1.1 enhancements." *McDaniel*, 398 F.3d at 551 n.10. Likewise, the instant case provides no occasion for resolving this uncertainty, because we would affirm the enhancement of Defendant's Guidelines range under any standard of review.

Defendant makes two arguments as to why the district court erred in applying a § 3B1.1 enhancement when calculating his advisory Guidelines range. First, Defendant contends that the substance of his participation in the conspiracy did not establish that he was an organizer or leader. Second, Defendant argues that the relevant criminal activity involved an insufficient number of persons to support the enhancement. These arguments will be addressed below.

Pursuant to U.S.S.G. § 3B1.1(a), an enhancement of four levels is appropriate if the defendant "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." In making this determination, a court should consider:

the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a

---

[3]Most of the authorities upon which Defendant relies focus on the now-overruled "indicia of reliability" standard that the Supreme Court set as a matter of the Sixth Amendment's Confrontation Clause in *Ohio v. Roberts*, 448 U.S. 56, 67 (1980), *overruled by Crawford v. Washington*, 541 U.S. 36 (2004), *as recognized in Davis v. Washington*, 126 S. Ct. 2266, 2275 n.4 (2006). Defendant cites no case, from this Circuit or otherwise, that extends these holdings to sentencing. Furthermore, as discussed in Part IV of this opinion, the Confrontation Clause does not apply at sentencing.

larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

*United States v. Hernandez*, 227 F.3d 686, 699-700 (6th Cir. 2000) (quoting U.S.S.G. § 3B1.1 cmt. n.4).

Here, the facts found by the district court support the conclusion that Defendant was an organizer or leader. The district court found that Defendant had demonstrated that he had held a leadership role by his conversation with Laurel on April 8, 2001. In that conversation, Defendant "figuratively looked Laurel in the eye and said, you know what you have to do," and this was "a pretty powerful indicat[or] of a supervisory relationship. He was giving orders." J.A. at 415. This fact demonstrates a significant "degree of control and authority exercised over others." *Hernandez*, 227 F.3d at 700. The district court also found that Defendant "was the man to whom Laurel was turning, and he was the man who was supplying Laurel with the drugs." J.A. at 415-16. The fact that Defendant was supplying Laurel with drugs demonstrates a significant degree of planning, organizing, and participation on the part of Defendant. The district court also noted that the amount of cocaine was worth $2 million, which it characterized as "massive," and it found that Defendant was "somebody with a large stake in the profitability." J.A. at 417-18. These facts go to Defendant's claimed right to the fruits of the crime and the nature and scope of Defendant's decision-making authority. In light of these facts, we conclude that the district court properly held that Defendant was an organizer or leader pursuant to U.S.S.G. § 3B1.1.[4]

Defendant also argues that his advisory Guidelines range could not be enhanced under U.S.S.G. § 3B1.1(a) because the criminal activity in which he participated did not involve five or more persons. We note that the district court correctly concluded that it need not find that Defendant was an "organizer or leader" of five people in order to apply the enhancement. In addressing the analogous inquiry under § 3B1.1(b), which provides a three-level enhancement if the defendant was a "manager or supervisor (but not an organizer or leader)," this Court stated that "there need only be evidence to support a finding that the defendant was a manager or supervisor of at least one other participant in the criminal activity, and that the criminal activity involved five or more participants or was otherwise extensive." *Henley*, 360 F.3d at 517. For the purpose of § 3B1.1(a), a "participant" is "a person who is criminally responsible for the commission of the offense, but need not have been convicted." *Id.* at 518 (quoting U.S.S.G. § 3B1.1 cmt. n.1).

Defendant argues that the facts of this case do not disclose the involvement of four other persons, because there is no evidence that Defendant controlled subsequent buyers, and therefore the Davis brothers and the persons to whom they sold cannot be counted for the purpose of § 3B1.1. Defendant relies on *United States v. Belletiere*, where the Third Circuit held that "[b]efore a supplier or customer may be deemed to have been a 'controlled' participant under § 3B1.1(a), the government must prove at least an interdependence between the defendant and the supplier or customer that would support an inference that the supplier or customer for personal use is answerable to the defendant." 971 F.2d 961, 970 (3d Cir. 1992). We need not decide, however,

---

[4]Defendant argues that "[c]ourts have found defendants to be leaders or organizers when they control such factors as the location, quantity, price, and participants in a drug transaction." Defendant's Br. at 30; *see United States v. Ortiz*, 878 F.2d 125, 127 (3d Cir. 1989) (holding that the defendant was an organizer or leader where he engaged in these activities). This argument lacks merit, because it attempts to narrow the factors that the district court can consider in a manner that is inconsistent with the Guidelines and our precedents interpreting them. *See Hernandez*, 227 F.3d at 699-700.

whether the reasoning of *Belletiere* should be adopted by this Court.[5] Even ignoring the persons who lacked contact with Defendant, the criminal activity in this case included five persons. The district court found that "there were four individuals that were nothing other than drivers of loads of cocaine or transporters of money back from Memphis to [Defendant]." J.A. at 413. Although it is not precisely clear to whom the district court is referring, the record supports the fact that "Canoso," Louis Pacheco, Laurel, and Joe Villanueva were all involved in transporting cocaine and money for Defendant. The district court's implicit finding that these individuals were "participants" under § 3B1.1 is not erroneous. Consequently, we hold that the district court properly imposed an upwards adjustment under § 3B1.1(a).

## III.   The Government did not Breach the Agreement

Defendant argues that the government breached the Agreement, and consequently, Defendant is entitled to specific performance in the form of a sentence calculated without reference to Laurel's proffer statement. The construction of a plea agreement "presents a question of law which this court reviews *de novo*." *United States v. Fitch*, 282 F.3d 364, 366 (6th Cir. 2002) (citing *Lancaster Glass Corp. v. Philips ECG, Inc.*, 835 F.2d 652, 658 (6th Cir. 1987)). Plea agreements are contractual in nature, and as such, courts are guided by general principles of contract interpretation when construing plea agreements. *See United States v. Mandell*, 905 F.2d 970, 973 (6th Cir. 1990). Plea agreements are to be enforced according to their terms. "[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." *Santobello v. New York*, 404 U.S. 257, 262 (1971). Because a defendant obtains a plea agreement only at the expense of his constitutional rights, "prosecutors are held to meticulous standards of performance." *United States v. Vaval*, 404 F.3d 144, 152-53 (2d Cir. 2005). "Satisfying this obligation requires more than lip service on a prosecutor's part. The *Santobello* rule 'proscribes not only explicit repudiation of the government's assurances, but must in the interests of fairness be read to forbid end-runs around them.'" *United States v. Saxena*, 229 F.3d 1, 6 (1st Cir. 2000) (brackets removed) (quoting *United States v. Voccola*, 600 F. Supp. 1534, 1537 (D.R.I. 1985)). The Court will thus construe "[a]mbiguities in a plea agreement . . . against the government." *Fitch*, 282 F.3d at 367 (citing *United States v. Randolph*, 230 F.3d 243, 248 (6th Cir. 2000)).

Defendant alleges that the government breached the Agreement in two distinct ways. First, Defendant argues that the government breached the Agreement by arguing at the sentencing hearing that Defendant's sentence should be enhanced for his role in the offense. Second, Defendant contends that the government breached the Agreement by providing damaging information to the probation office.

---

[5]A potential tension exists between the reasoning of *Belletiere* and the principles underlying "chain" conspiracies. Drug distribution conspiracies may often take the form of "chain" conspiracies involving "numerous sales and resales of drugs until they reach the ultimate consumers," and this Court has held that "in such circumstances a common scheme or plan can be inferred despite the absence of a formal agreement because of the interdependence of the enterprise." *United States v. Lopez-Medina*, 461 F.3d 724, 748 (6th Cir. 2006) (internal quotations omitted). *Belletiere*'s requirement of an "inference that the supplier or customer for personal use is answerable to the defendant" is arguably *more stringent* than the standard for finding that two defendants are in the same conspiracy. Thus, a court applying *Belletiere* could conceivably arrive at the perplexing conclusion that, notwithstanding the fact that two or more individuals participated in the same conspiracy, they could not be considered "criminally responsible for the commission of the offense," as the Guidelines commentary defines "participant." Moreover, *Belletiere*'s reference to "controlled" participants is not supported by the text of the Guidelines. The defendant must be "an organizer or leader of a criminal activity" and *that activity* must involve more than five or more participants–there is no requirement that a district court identify four "controlled participants." The Guidelines, in fact, do not employ that term.

The pertinent provision of the Agreement states:

7.          The government agrees that it will not recommend or request a sentencing enhancement for the defendant's role in the offense (§3B1.1) *during the preparation of the Presentence Investigation Report* (PSR). In this regard, Mr. MONCIVAIS understands that the government's position is not binding on the court or the probation office and that if the court does apply an enhancement for leadership role, he will not be allowed to withdraw his plea of guilty. This is not intended to limit either party in responding to issues raised at the sentencing hearing.

J.A. at 123-24 (emphasis added).

The plain language of the Agreement requires us to conclude that the government did not breach its obligations under the Agreement by arguing for a sentencing enhancement before the district court, because this occurred *after* the preparation of the PSR. The determinative factor in interpreting a plea agreement is not the parties' actual understanding of the terms of the agreement; instead, an agreement must be construed as a reasonable person would interpret its words. *United States v. Ykema*, 887 F.2d 697, 699 (6th Cir. 1989). The Agreement spells out the obligations of the parties in clear detail. A reasonable person reading paragraph 7 would understand that the government's obligation thereunder was limited to not recommending an enhancement during the time in which the probation office was preparing the PSR. After the PSR was completed, the government's obligation was at an end.

Other provisions of the Agreement reinforce this interpretation. Paragraphs 5 and 6 of the Agreement both state that the government "agrees to recommend" certain courses of action, without specifying when or to whom the recommendation will be addressed. This supports the inference that the limitation of the government's obligation in paragraph 7 was intentional, rather than the result of an oversight or careless drafting. The government therefore did not violate its obligations under paragraph 7 of the Agreement, because it did not recommend that Defendant receive a sentencing enhancement until after the PSR was completed.

Defendant principally relies upon *Fitch*. In *Fitch*, this Court had to give meaning to a provision in the plea agreement that stated that "the government agrees to recommend that the defendant's base offense level be calculated using 1000 pounds of marijuana and 1 kilogram of cocaine and that no other relevant conduct be used to increase the defendant's base offense level." 282 F.3d at 366-67 (brackets removed). At sentencing, the government had argued that Fitch should receive a four-level enhancement for his role in the offense; Fitch contended that this breached the plea agreement. *Id.* at 366. On appeal, the government argued that "base level offense" was a term of art under the Guidelines, and a role-in-the-offense adjustment was an adjustment *to* the base offense level. *Id.* at 367. This Court disagreed, reasoning that "relevant conduct" was also a term of art under the Guidelines, which encompassed the role-in-the-offense adjustment. Because the plea agreement stated that "no other *relevant conduct* [shall] be used to increase the defendant's base offense level," the plea agreement was ambiguous, and had to be construed in Fitch's favor. *Id.* at 367-68 (emphasis added). *Fitch*, however, is distinguishable because in *Fitch* the language of the plea agreement was genuinely ambiguous. By contrast, the import of the language of the Agreement in the instant case is clear, and *Fitch*'s rule that ambiguity in plea agreements must be construed against the government is not triggered.

Defendant's second argument is that the government breached the Agreement by providing the probation office with the information upon which it relied in recommending that Defendant's

sentence be enhanced.[6] The government retorts that it did not recommend or advocate for a higher sentence, but merely provided the probation office with relevant factual information. The question therefore becomes whether providing factual information to the probation office constitutes "recommend[ing] or request[ing] a sentencing enhancement" under the terms of the Agreement. We conclude that it does not.

In the analogous case of *United States v. Levy*, 374 F.3d 1023 (11th Cir. 2004) (per curiam), *vacated on other grounds*, 545 U.S. 1101 (2005), Levy claimed that the government had breached his plea agreement by providing the probation office with information that caused the office to recommend that Levy's sentences be served consecutively, in violation of his plea agreement. The court noted that "Levy's plea agreement did not bind the government to refrain from providing factual information to the probation officer–it only required that the government recommend to the court that Levy's sentences be served concurrently, which the government did." *Id.* at 1030. The court drew a distinction between cases where the government "affirmatively advocated to the district court positions that contradicted its express obligations under the plea agreements" and "this case, [where] the government provided only factual information about Levy's offenses to the probation officer." *Id.* at 1032.

Additionally, several cases draw an analogous line between advocacy, on one hand, and providing the district court with relevant factual information, on the other hand. *See, e.g.*, *United States v. Munoz*, 408 F.3d 222, 227 (5th Cir. 2005) (noting that "[a]lthough the Government has a duty to provide the sentencing court with relevant factual information . . . it may not hide behind this duty to advocate a position that contradicts its promises in a plea agreement" and concluding that the government "crossed the line to breach by affirmatively advocating" (footnotes omitted)); *Saxena*, 229 F.3d at 6 ("The government's obligation to furnish relevant information to the sentencing court does not vanish merely because the government has a corollary obligation to honor commitments made under a plea agreement."); *United States v. Hand*, 913 F.2d 854, 856 (10th Cir. 1990) ("A promise to 'recommend a reduction' is not a promise to stand mute in the face of incorrect or misleading testimony offered before the trial court."); *cf. United States v. Boatner*, 966 F.2d 1575, 1578 (11th Cir. 1992) (noting that although "[t]he solemnization of a plea agreement does not preclude the government from disclosing pertinent information to the sentencing court," the government can "restrict the facts upon which the substantive offense is based"). This line is equally appropriate to draw when the issue concerns advocacy (as opposed to merely providing information) to the probation office.

In this case, the plea agreement merely prohibited the government from "recommend[ing] or request[ing] a sentencing enhancement." J.A. at 123-24. Moreover, the information that the government provided to the probation office was necessary to correct false or incomplete statements of fact made by Defendant. Because there is no indication that the government recommended to the probation office that Defendant receive an enhanced sentence, we hold that the government did not violate its obligations under the Agreement. This is true notwithstanding the fact that the government provided factual information to the probation office that caused that office to recommend that the district court enhance Defendant's sentence.

## IV. Defendant's Constitutional Challenges Lack Merit

Defendant argues that his constitutional rights were violated in two ways. His arguments are without basis. First, Defendant argues that the Fifth Amendment's Due Process Clause requires that facts affecting the length of his sentence be determined by a jury beyond a reasonable doubt.

---

[6]Although the record does not disclose exactly what information the government provided to the probation office, the clear implication of Defendant's argument is that the government was the source of the additional information ultimately provided by Laurel. The government does not dispute this implication.

We recently rejected this exact proposition in *United States v. Gates*, 461 F.3d 703, 708 (6th Cir.) ("[W]e find that judicial fact-finding in sentencing proceedings using a preponderance of the evidence standard post-*Booker* does not violate either Fifth Amendment due process rights, or the Sixth Amendment right to trial by jury."), *cert. denied*, 127 S. Ct. 602 (2006). Defendant's argument is thus squarely foreclosed by *Gates*.

Defendant also argues that the admission of testimonial hearsay against him at sentencing, where the declarant did not testify, and he had not had an opportunity to cross-examine the declarant, violated his rights under the Sixth Amendment's Confrontation Clause. This argument fares no better. As Defendant recognizes, this Court recently ruled that the Confrontation Clause does not apply at sentencing. *United States v. Katzopoulos*, 437 F.3d 569, 576 (6th Cir. 2006) ("[T]here is nothing specific in *Blakely* [*v. Washington*, 542 U.S. 296 (2004)], [*United States v. Booker*, 543 U.S. 220 (2005)] or *Crawford* [*v. Washington*, 541 U.S. 36 (2004)] that would cause this Court to reverse its long-settled rule of law that [the] Confrontation Clause permits the admission of testimonial hearsay evidence at sentencing proceedings."). We consequently find no violation of the Confrontation Clause.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** Defendant's conviction and sentence.